# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 18, 2009

## STATE OF TENNESSEE v. DONALD KNIGHT

### Appeal from the Circuit Court for Rutherford County
#### No. F-58588    Don R. Ash, Judge

---

### No.  M2008-01023-CCA-R3-CD - Filed August 17, 2009

---

Appellant, Donald Knight, was indicted by the Rutherford County Grand Jury for felony murder and aggravated child abuse after the death of five-month-old T.J.[1]  Appellant was convicted by a jury of the lesser included offense of voluntary manslaughter and aggravated child abuse.  He was sentenced as a Range I standard offender to five years at 30% for the voluntary manslaughter conviction. Appellant received a sentence of twenty years for the aggravated child abuse conviction, to be served at 100% in incarceration.  The sentences were ordered to run concurrently.  Appellant filed a motion for new trial that was denied by the trial court.  On appeal, Appellant argues that the trial court improperly denied a continuance and that the evidence is insufficient to support the convictions.  We determine that Appellant failed to show actual prejudice resulting from the denial of the continuance and that the evidence was sufficient to support the convictions.  Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

John Driver, Assistant Public Defender, Murfreesboro, Tennessee, for the appellant, Donald Knight.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Roberge, Assistant Attorney General; William Whitsell, District Attorney General, and Laurel Hemmingway, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]It is the policy of this Court to refer to minor victim's by their initials.

**OPINION**

On March 7, 2006, a 911 call was placed from 411 Ross Drive, in Smyrna, Tennessee, the home of Jennifer Jones. According to the caller, T.J., Ms. Jones' five month-old son, was not breathing. The child died after being transported to the hospital.

Initially, medical personnel determined that T.J. had died of sudden infant death syndrome, or SIDS. The preliminary autopsy report, however, indicated that the child had been shaken. An investigation was conducted by Detective Jeffrey Duke of the Smyrna Police Department. Detective Duke interviewed the occupants of the residence, including Ms. Jones and her mother Kathy Jones. Detective Duke also interview Kathy Jones's boyfriend Steve Camp, who frequently stayed at the residence, and Appellant, Ms. Jones' boyfriend. At the time of T.J.'s death, Appellant was often the care giver for the child while Ms. Jones was participating in an educational internship.

When Appellant was interviewed in connection with the investigation, he admitted that he had shaken the baby but stated that it "wasn't that hard" and only occurred "a couple of times." Appellant stated that he "didn't think that that would ever kill him." Appellant recalled the baby gasped for air but did not tell Ms. Jones because he was worried that she would "fly off the hinges."

Appellant was indicted in May of 2006 by the Rutherford County Grand Jury for felony murder and aggravated child abuse. The trial was set to begin in December of 2006. Prior to trial, Appellant requested a continuance in order to find an expert witness. The trial court granted Appellant's first request and rescheduled the trial for February of 2007. Appellant sought a second continuance on the basis that his expert was not under contract and would not be able to testify in February. The trial court complied with this request and, after consulting with the expert, the case was reset for May 2007.

Approximately one month prior to the trial date, Appellant sought a third continuance. Apparently, the expert witness had been given the dates of trial and had agreed to be present for the trial but had forgotten to mark a "personal matter" on his calendar. Because of this mistake, Appellant's expert would not be available for all of the trial dates but could attend about three to four hours on one of the scheduled trial dates. Appellant thought that a continuance would be beneficial to ensure that his expert would be available for the entire trial.

The trial court denied the motion. However, the trial court expressed that it was willing to be flexible to a certain extent. Appellant renewed the motion to continue on April 30, 2007, again stating that the expert's absence during the entire trial would serve to diminish his testimony. The trial court denied the motion. As a result, Appellant's expert did not testify at trial. His report was admitted through the testimony of the State's expert witness, Dr. Bruce Levy.

The trial began as scheduled. At trial, Ms. Jones testified that March 7, 2006, began as a normal day. She arose that morning around 6:30 a.m. with her son. Kathy Jones helped Ms. Jones get T.J. ready for the day and feed him while Ms. Jones was showering and getting ready for work.

Ms. Jones left the house at around 8:00 a.m. for work. Kathy Jones watched T.J. for part of the day. Kathy described T.J. as restless that day but thought that it might be due to teething. According to Kathy, T.J. ate and drank normally and took a nap.

Appellant came to pick up the child around 2:00 p.m. Appellant and Ms. Jones had been dating for several months. Appellant often watched T.J. Ms. Jones felt like she could trust Appellant with her child.

Ms. Jones picked up T.J. at around 5:15 p.m. that day at Appellant's parent's house. T.J. was sleeping but cried when he was awakened. Ms. Jones thought that he was hungry but when she tried to feed him he refused to eat. Ms. Jones took him home and T.J. was fussy for the rest of the evening. Around 9:00 p.m., Ms. Jones got a telephone call from her mother and had to step out of the room so that she could hear her mother over T.J.'s crying. She handed the baby to Appellant when she stepped out of the room. When Ms. Jones returned to the room, T.J. had stopped crying and appeared to be asleep.

At that time, Ms. Jones and Appellant got the baby ready for bed. Appellant laid him down in the crib, and Ms. Jones kissed the child goodnight. Ms. Jones made sure that the volume on the baby monitor was on high because she expected T.J. to wake up hungry.

Ms. Jones went to bed around 9:30 p.m. Appellant was still there at the time. At around 10:30 p.m., Steve Camp arrived at the house. Appellant came outside as Mr. Camp was entering the residence. Appellant reported that T.J. was sleeping "good." Mr. Camp went inside, ate something, then went to Kathy Jones's room and waited for her to come home. Mr. Camp did not enter T.J.'s room that evening.

Kathy Jones returned home around 11:15 p.m. She immediately went to T.J.'s room to check on him, like she did every night. She immediately noticed that he was pale and found the child to be cold and limp when she picked him up. Kathy Jones ran screaming through the house for Ms. Jones. Mr. Camp called 911 and reported that the child was lifeless and pale.

The family attempted CPR on the child until the Smyrna Police arrived and took over. Rutherford County Emergency Medical Services arrived at the residence at 11:36 p.m. and continued to administer CPR to the child. They noted no visible marks or bruises on the child as they transported him to Stonecrest Medical Center.

When the child arrived at the hospital, his heart was not beating, and he was unable to breathe independently. He was treated by Dr. Lori Lynch. When T.J. arrived at the hospital, he had no pulse and no responsive function. There was no visible trauma noted by the emergency room personnel or the emergency medical personnel. He was treated for approximately thirty minutes before being pronounced dead.

An autopsy was performed by Dr. Levy, the Chief Medical Examiner for Rutherford County. The external exam of the body was "unremarkable." The child presented with two small bruises, one on his head and one on his right buttocks. According to the doctor, the child appeared to be well cared for and a typical size and weight for his age. The autopsy revealed a significant amount of bleeding in the brain, approximately four ounces of blood. This amount of blood in the subdural space would be lethal to an adult. The brain displayed evidence of acute subdural and subarachnoid hemorrhages, retinal hemorrhaging, and shearing injuries to the axons. Dr. Levy explained that the injuries were indicative of a "shaken" baby. There was also evidence of a prior subdural hemorrhage that was approximately one month old.

The conclusion of the autopsy was that T.J. died as a result of trauma at the hands of another person. The trauma was most likely blunt force trauma that occurred within minutes to hours of the child's death. The cause of death was brain hemorrhaging as a result of trauma. According to Dr. Levy, at the time the trauma was inflicted, the child would have immediately become symptomatic, even comatose, with changes in skin color and breathing difficulties.

Appellant contended through the written opinion of Dr. Elias G. Chalhub, that T.J.'s death was caused by a "re-bleed" of the old injury. The "re-bleed" theory contends that as the body is healing an injury, it is more vulnerable in that area, making it more susceptible to repeat injury at that time. Dr. Chalhub opined that the subarachnoid hemorrhage could be a result of a re-bleed of the older injury that the child had suffered. Dr. Levy rejected that conclusion. According to Dr. Levy, the theory does not make sense. He explained that the tissue that has healed or healing is not any more likely to bleed than other tissue. Secondly, Dr. Levy explained that a re-bleed would not account for injuries as significant as T.J.'s. A re-bleed would not cause the amount of blood loss that the child suffered, and the old injury was only on one side of the brain. At the time of the autopsy, there were injuries on both sides of the brain.

Dr. Mark Becher, the director of neuropathology at Vanderbilt, concurred with Dr. Levy's assessment. Dr. Becher opined that the injuries to T.J., which ultimately led to his death, occurred within three hours of his death. Dr. Becher agreed that upon infliction of the fatal injuries, T.J. would have become symptomatic. Dr. Becher also rejected the re-bleed theory and explained that even if the child's injuries had occurred in the emergency room, he would not have survived.

Appellant called Smyrna Police Officer Jason Anderson to testify in his behalf. According to Officer Anderson, he responded to the emergency call on March 7, 2006. According to his "checklist," Ms. Jones was the last person to be with or see the child prior to the emergency call. Further, Mr. Camp had a noticeable odor of alcohol about his person at the time Officer Anderson responded to the call.

After hearing the evidence, the jury convicted Appellant of voluntary manslaughter and aggravated child abuse. As a result of the convictions, he was sentenced to an effective sentence of twenty years. After the denial of a motion for new trial, Appellant appealed his convictions.

*Analysis*
*Denial of Continuance*

On appeal, Appellant argues that the trial court improperly denied a continuance. Specifically, Appellant argues that due to the "complex medical issues" he "was at a severe disadvantage proceeding at trial without assistance of a medical expert." Appellant argues that his expert's testimony about a re-bleed theory coupled with the fact that there was no proof Appellant did anything to cause the child's injuries would "meet the standard for reversal" in this case. The State argues that the trial court did not abuse its discretion and Appellant has failed to establish prejudice by the denial of the continuance, especially in light of the fact that his expert's report was submitted to the jury for consideration.

The granting of a continuance rests within the sound discretion of the trial court. *State v. Thomas*, 158 S.W.3d 361, 392 (Tenn. 2005); *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995). In order to show prejudice, the defendant must demonstrate that a different result might reasonably have been reached if the trial court had granted the continuance or that the denial of the continuance denied the defendant a fair trial. *Id.* "Moreover, a defendant who asserts that the denial of a continuance constitutes a denial of due process or the right to counsel must establish actual prejudice." *Odom*, 137 S.W.3d at 589. This Court has recognized that a continuance might be appropriate in order to afford a defendant a "reasonable opportunity" to locate a witness. *State v. Morgan*, 825 S.W.2d 113, 117-18 (Tenn. Crim. App. 1991). However, the burden rests with the defendant to show that a continuance might have reasonably resulted in locating the witness. *Id.*; *see also Brown v. State*, 489 S.W.2d 855, 857 (Tenn. Crim. App. 1972).

According to the record in the case herein, the case was originally set for trial in December of 2006. Counsel for Appellant requested a continuance to obtain an expert witness in early December. The trial court granted this request and set the case for trial in February of 2007. Prior to trial, Appellant sought a second continuance in order to finalize the contract with the expert. The trial court granted the second request for continuance and reset the case for trial in May. Prior to the May 2007 trial date, Appellant sought a third continuance because his retained expert could not attend the entire trial and could only be available for three to four hours on one day of the trial. Apparently, the expert forgot to note a personal matter on his calendar when he agreed to become an expert at Appellant's trial. The trial court denied this motion to continue but assured Appellant that there would be flexibility with regard to the presentation of the proof at trial. The trial court expressed its desire to accommodate Appellant's schedule in any way possible.

Appellant renewed his motion to continue, offering to remain incarcerated and waive any future claims for speedy trial violations. The trial court refused to grant the continuance. We determine that the trial court has not abused its discretion. The trial court offered a great deal of flexibility in the trial process and had already granted two continuances. Further, Appellant did not present the testimony of the expert or any additional evidence at the hearing on the motion for new

trial to support a showing of actual prejudice. The defense expert's report was ultimately introduced at trial and was available for the jury to consider. The trial court did not abuse its discretion in denying the third continuance. Appellant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Next, Appellant challenges the sufficiency of the evidence. Specifically, Appellant complains that there is no proof that Appellant knowingly caused injury to T.J. Further, Appellant argues that the State failed to prove the elements of voluntary manslaughter or criminal homicide. The State disagrees, arguing that "the jury rejected the theory that [T.J.'s] death was caused by a re-bleed and accredited the State's theory that [Appellant], after dealing with a crying, fussy baby for hours, violently shook T.J. causing profuse bleeding in his brain that led to his death."

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S .W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from reweighing or reevaluating the evidence when considering the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). Of course, a criminal offense may be established exclusively by circumstantial evidence. *State v. Tharpe*, 726 S.W.2d 896, 900 (Tenn. 1987); *State v. Jones*, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995). However, the trier of fact must be able to "determine from the proof that all other reasonable theories except that of guilt are excluded . . . ." *Jones*, 901 S.W.2d at 396; *see also, e.g., Tharpe*, 726 S.W.2d at 900.

Voluntary manslaughter requires proof that the defendant intentionally or knowingly killed another "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). The jury is responsible for reviewing the evidence to ascertain whether it supports a finding of adequate provocation. *State v. Williams*, 38 S.W.3d 532, 539 (Tenn. 2001).

Further, to convict Appellant of aggravated child abuse, the State was required to prove: (1) that Appellant knowingly, other than by accidental means treated T.J. in such a manner as to inflict injury; and (2) that the act of abuse resulted in serious bodily injury. *See* T.C.A. §§ 39-15-401(a) & -402(a)(1). Serious bodily injury includes bodily injury which involves: "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(a)(34). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-106(a)(20). To convict Appellant of felony murder, the State had to prove that T.J. was killed "in the perpetration of or attempt to perpetrate any . . . aggravated child abuse." T.C.A. § 39-12-202(a)(2). The State was not required to prove a culpable mental state, other than "the intent to commit the enumerated offense." T.C.A. § 39-12-202(b).

After a review of the evidence, we conclude that there was sufficient evidence presented at trial for a rational trier of fact to find Appellant guilty of aggravated child abuse and felony murder. There was testimony from Ms. Jones that T.J. was crying and fussy when she left the room to take a telephone call from her mother and that the child had stopped crying and appeared to be asleep when she came back into the room a few minutes later. Appellant was the only person in the room with T.J. at that time. Ms. Jones testified that she then helped Appellant put the child in bed and kissed the child goodnight. Dr. Levy testified that after suffering the type of injuries that T.J. suffered the child would likely have been in a comatose state. Further, T.J. had injuries consistent with those that would be sustained by a "shaken baby." Dr. Levy stated that there was a large amount of blood in the child's brain and that an adult suffering injuries of this magnitude would have likely died. He opined that the victim died as a result of blunt head trauma. Appellant himself admitted in his statement to police that he shook the child and that he did not tell Ms. Jones because she was under a lot of stress.

After reviewing the evidence, we conclude that the evidence presented was sufficient to support a conviction of Appellant's indicted crime of felony murder. *See* T.C.A. § 39-12-202(a)(2). A reasonable jury could have determined that Appellant shook the child violently in order to quiet him while his mother stepped out of the room to take a telephone call. Accordingly, because the evidence was sufficient to support a felony murder conviction, it was also sufficient to support a conviction for the lesser included offense of voluntary manslaughter. *See State v. Dominy*, 6 S.W.3d 472, 477 n.9 (Tenn. 1999) (noting that "voluntary manslaughter is a lesser-included offense of first and second degree murder"). Furthermore, when "the evidence [is] sufficient to support [a] conviction for the greater offense charged, the defendant cannot complain of the jury finding him guilty of the lesser offense." *McDonald v. State*, 512 S.W.2d 636, 640 (Tenn. Crim. App. 1974); *see also State v. Carrie Ann Brewster*, No. E2004-00533-CCA-R3-CD, 2005 WL 762604, at *3 (Tenn. Crim. App., at Knoxville, Apr. 5, 2005) (citing *McDonald* for the same proposition). Accordingly, this issue is without merit.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____

JERRY L. SMITH, JUDGE